**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**
**CIVIL ACTION NO. 03-166-JGW**

ODD FELLOWS, LLC, et al.,                                        PLAINTIFFS

v.

E. KINKER & CO., et al.,                                        DEFENDANTS


<u>**MEMORANDUM OPINION AND ORDER**</u>

This case concerns an historic building which was nearly destroyed by fire in the midst of its renaissance. Fortuitously - or not- as the case may be - the owners attempted to double their insurance coverage on the building shortly before the calamity. A dispute quickly arose as to whether the 2.1 million dollar increase in coverage was in effect at the time of the fire. Under pressure for renovation funds, the owners settled their claims with their insurer without filing suit against that entity. Invoking diversity jurisdiction, the owners thereafter filed suit against their insurance agent and his agency for failing to obtain the requested increase in coverage from the insurer, Ohio Casualty.

The defendants have now moved for summary judgment on the grounds that they did in fact obtain the requested insurance.[1] Summary judgment will be partially granted and partially denied for the reasons explained herein.

---

[1] The parties have consented to disposition by the undersigned magistrate judge pursuant to 28 U.S.C. §636(c).

1

I.    **Background**

The insured plaintiffs are Odd Fellows, LLC and Odd Fellows II, LLC ("Odd Fellows").[2]  The named defendants are the insurance agency, E. Kinker & Co. ("Kinker"), and Kinker owner-agent Sam Tuten ("Tuten").  Odd Fellows' specific claims include breach of implied contract, breach of fiduciary duty, negligent misrepresentation and intentional misrepresentation in connection with the defendants' alleged failure to secure the requested insurance coverage. [Compl. ¶ 1].

The Odd Fellows Hall is a three-story brick building built in the mid-nineteenth century in Covington, Kentucky. [Compl. ¶ 7].  Damian Sells, Kelly Sells and Tony Milburn formed Odd Fellows, which purchased the Hall in April 2001 for $550,000 with the intent to renovate and lease it for commercial use. [Compl. ¶¶ 2, 8].

Odd Fellows contacted Tuten to obtain insurance.  Tuten submitted a request for a quote for replacement cost coverage with limits of $7,612,500 to Ohio Casualty.  [Fischer depo. at 24, 25].  John Fischer and Robert Mackendrick, two Ohio Casualty employees, reviewed and/or provided a quotation for the cost of such coverage [Fischer depo. at 32, Mackendrick depo. at 26].  Ultimately, Odd Fellows determined that the cost of such high coverage could not be justified because financing had not then been secured for the renovations.  As an alternative, Tuten submitted a revised application to Ohio Casualty for a less costly "actual cash value" ("ACV") policy worth $2,000,000.  [Fischer depo. at 42].  Fischer was aware that plaintiffs eventually intended to convert the ACV policy to

_____

[2]The Odd Fellows Group derived their name from the Odd Fellows fraternal organization, which originally built the Hall in 1856.

replacement cost coverage, but never communicated that information in writing or orally to anyone at Ohio Casualty. [*Id.* at 42-44, 133-134]. Ohio Casualty issued the $2,000,000 ACV policy for the period April 27, 2001 to April 27, 2002. [Fischer depo. at 51, 52].

Between May 2001 and March 2002, Odd Fellows was actively negotiating a construction contract for the renovation. In April of 2002, Odd Fellows had nearly finalized a renovation contract with Mansur, Inc ("Mansur"), a construction company which specializes in the renovation of historic buildings. The proposed contract required Odd Fellows to pay Mansur in full if the work was not completed for reasons outside of Mansur's control. [Compl. ¶ 11].

In light of the impending renovation, Odd Fellows sought to increase its insurance coverage beyond a renewal proposal which included only an adjustment for inflation.[3] On April 15, 2002, Tuten met with Odd Fellows to execute a Statement of Values, requested by Ohio Casualty. [D. Sells depo. at 67, 68]. Tuten advised Odd Fellows to change its coverage from the "actual cash value" policy to a "replacement cost value" policy, with the total value set at $4,200,000. [Compl. ¶ 12]. Odd Fellows relied on Tuten to execute the change. [D. Sells depo. at 75].

The Change Request and a Statement of Values in the amount of $4.2 million were sent by Tuten on or about April 22, and received by Ohio Casualty on April 25, 2002. [Arnett depo. at 82]. Ohio Casualty employee Johna Garry-Neu, an associate assigned to help underwriter Shannon Arnett, testified that she retrieved the documentation from the insurer's electronic file queue system on May 1. [Garry-Neu depo. at 45, 46, 74]. Although Ms. Garry-Neu believed that she approved the Change

---

[3] The five percent adjustment for inflation resulted in a coverage increase to $2.1 million in the ACV policy.

Request and/or forwarded it to the ratings department to be processed [Garry-Neu depo. at 51-54],

she informed no one at Ohio Casualty of this action.  Ohio Casualty records reflect that the documents

were received but reflect no retrieval, approval, or processing prior to the fire. [Garry-Neu depo. at

54].

On May 21, 2002, Odd Fellows Hall was nearly destroyed by fire. [Compl. ¶ 17].   The

destruction was so great that various city officials and others believed that the remainder of the building

should be demolished rather than rebuilt.  Between May 21 and May 24, 2002, Odd Fellows had

contact with Tuten, but not with Ohio Casualty.  Tuten assured Odd Fellows that they had "plenty of

insurance" to rebuild [Tuten depo. at 17], that $4,200,000 coverage was in place, and that Odd

Fellows would receive a "windfall" [K. Sells depo. at 50, 51].  Odd Fellows thereafter expended

$500,000 to erect steel supports in anticipation of proceeding with the original renovation. [Compl. ¶

19].

On May 24, 2002, Ohio Casualty informed Odd Fellows that the insurer had not approved the

request for additional coverage. [Compl. ¶ 20].  Ohio Casualty initially offered to pay only $638,000,

plus an additional amount for demolition and cleanup, on the original $2.1 million ACV policy.

Notwithstanding Ohio Casualty's position, plaintiffs allege that Tuten initially continued to represent that

plaintiffs had $4.2 million in coverage.  [D. Sells depo. at 171, 172].  During subsequent negotiations

with Ohio Casualty, plaintiffs requested the underwriting file maintained by the insurer as well as sworn

statements taken by Ohio Casualty; however, the insurer denied plaintiffs' requests.  In December

2002, plaintiffs decided to accept Ohio Casualty's offer of $2.1 million in settlement rather than

proceed with litigation against their insurer. [D. Sells depo. at 237, 238].   Plaintiffs subsequently filed a

4

complaint in this court against their insurance agency, Kinker, and agent Tuten.

In their present motion, the defendants argue that they actually obtained $4.2 million in replacement cost value coverage from Ohio Casualty. Defendants base their arguments in part on documents obtained during the discovery phase of this litigation. Defendants contend that Ohio Casualty should be estopped from denying the Change Request and/or that Ohio Casualty is bound by the apparent scope of authority of its agents. Additionally, the defendants assert that no basis exists for the plaintiffs' claims of negligent and intentional misrepresentation.

## II.     Analysis

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may discharge its burden by "pointing out...an absence of evidence" to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Accordingly, the nonmoving party cannot rest on its pleadings, but must identify specific facts that remain for the finder of fact at trial. *See id.* at 324. Although all inferences are drawn in favor of the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

In support of their motion, defendants argue first that they are not liable for the plaintiffs' loss either because Ohio Casualty is estopped from denying full replacement value coverage and/or because Ohio Casualty is bound by the apparent scope of authority of Tuten and Kinker to the full replacement

value coverage. Whether or not the coverage existed, the defendants next contend that they did not

negligently or intentionally misrepresent that the Hall was insured with replacement value coverage.

Defendants are entitled to judgment in their favor on the intentional misrepresentation claim, but

summary judgment otherwise will be denied because material issues of fact exist concerning whether

coverage existed and defendants' alleged negligence..

### A.    Causation

Defendants argue that they did not cause the plaintiffs' loss because Odd Fellows Hall actually

was insured for $4.2 million in replacement cost coverage.   The defendants essentially assert that Ohio

Casualty is responsible for the loss, and that the defendants should not be held responsible for the

plaintiffs' inadequate settlement with their insurer.  Defendants' contention that Ohio Casualty should be

deemed to have issued the $4.2 million policy rests on the application of two doctrines of law: equitable

estoppel and agency.

### 1.    Equitable Estoppel

Defendants first argue that Ohio Casualty is equitably estopped from denying the $4.2 million

replacement value coverage to Odd Fellows.  The elements of estoppel are set out in *Howard v.*

*Motorists Mutual Ins. Co.*:

> (1)    Conduct, including acts, language and silence, amounting to a representation or concealment of material facts;

> (2)    the estopped party is aware of these facts;

> (3)    these facts are unknown to the other party;

> (4)    the estopped party must act with the intention or expectation his conduct will be acted upon; and

(5)      the other party in fact relied upon this conduct to his detriment.

955 S.W.2d 525, 527 (Ky. 1997).

In *Howard*, the plaintiff asserted equitable estoppel against her insurance company.  The insurance company had continually accepted late premium payments, even when the plaintiff's insurance coverage had lapsed.  During the period of time in question, the insurance company cashed a late premium check, retained the funds for two weeks, and issued the plaintiff a receipt.  *Id*. at 526.  However, pursuant to a company policy regarding frequent policy lapses, an underwriter subsequently sent a letter relinquishing coverage and refunding the premium.  *Id*. at 526.  The plaintiff was involved in a car accident prior to receipt of that letter.  *Id*.  The court held that the insurance company was estopped from denying coverage, because "by cashing [plaintiff's] check and retaining the money for two weeks without informing her of the conditional nature of the acceptance, [defendant] concealed facts of which it was uniquely aware."  The court particularly focused on the insurer's prior course of conduct in accepting late payment from the plaintiff.  *Id*. at 529.

As illustrated in *Howard*, equitable estoppel is typically used as an offensive tool by an injured plaintiff against a defendant in litigation.  *See, e.g., Dailey v. American Growers Ins.*, 103 S.W.2d 60, 68 (Ky. 2003)(discussing colorable claim of estoppel against defendant insurer by insured based upon agent's conduct); *Travelers Fire Ins. Co. v. Bank of Louisville*, 243 S.W.2d 996 (Ky. Ct. App. 1951)(concurrence, precluding application of doctrine by plaintiff insured against the defendant insurer, rejecting plaintiff's claim that insurance broker's actions bound defendant insurer).

Unlike *Howard* and *Dailey*, in this case the defendants seek to apply the doctrine of estoppel against a non-party, Ohio Casualty.   Defendants cite no case law applying the doctrine on similar facts.

7

Estoppel is an equitable doctrine.  It would be inequitable to permit a defendant to escape liability by applying the doctrine against an entity which is not before this court to defend itself.  Defendants incorrectly assert: "In light of Plaintiffs' settlement with Ohio Casualty, Ohio Casualty could not be joined as a proper party to this action."  Although plaintiffs' settlement agreement presumably precludes plaintiffs from suing Ohio Casualty, defendants are not precluded from bringing a claim against the insurer. [4]

Even if the defendants could assert estoppel against Ohio Casualty, genuine issues of material fact preclude summary judgment on the present record.  Conflicting and inconclusive testimony exists as to: 1) whether Ohio Casualty conducted itself in a manner amounting to a representation or concealment of material facts; and 2) what Ohio Casualty knew concerning the status of the Change Request.

Defendants argue that information obtained during the discovery phase of this litigation reflects that Ohio Casualty was aware of plaintiffs' ultimate intent to convert coverage on Odd Fellows Hall from an actual cash value policy to a replacement value coverage policy.[5]  Noting that Ohio Casualty provided a rate quotation for a $7 million policy, defendants claim that they had no reason to believe that the insurer would reject a $4.2 million replacement policy.   On the other hand, even if Ohio

_____

[4]The court's decision on defendants' present motion should not be read as any indication of the court's ruling should defendants choose to implead Ohio Casualty and present a similar argument in the future.

[5]Defendants argue that plaintiffs could have obtained pre-litigation discovery from Ohio Casualty which could have shown that Ohio Casualty had approved the requested increase in coverage.  However, Ohio Casualty refused to provide requested documents prior to settlement, and pre-litigation discovery is a tool which is rarely permitted under Rule 27(a), Fed. R. Civ. P.

Casualty through Fischer was aware of plaintiffs' plan to obtain replacement value coverage at some point, Ohio Casualty knew only that the plan was a "someday" intention expressed more than a year before the fire. There is no evidence that Ohio Casualty knew and approved of plaintiffs' intent to execute their intention at the time in question.

Defendants assert that Ms. Garry-Neu was Ohio Casualty's employee-agent, and that her testimony that she approved the change request should be sufficient to bind Ohio Casualty, whether or not she had actual authority to do so. However, the present record contains a dispute concerning whether Ms. Garry-Neu did in fact retrieve and/or approve the change request, in that electronic records contradict her deposition testimony that she did so. The doctrine of estoppel requires conduct which leads to reliance by the party claiming estoppel. Defendants present no evidence that they were aware of conduct by any Ohio Casualty employee which could have led them to believe the change request was approved by Ohio Casualty. Instead, defendants rely on the adage that "no news is good news," suggesting that hearing nothing back from the insurer by the time of the fire led defendants to believe that the request had been approved. However, defendants offer no evidence concerning industry standards on processing time for change requests. Therefore, the fact that defendants had not heard back from Ohio Casualty has little meaning on the present record.

To support their claim of estoppel, defendants also rely in part on an internal Ohio Casualty email authored by employee MacKendrick on the day of the fire, which acknowledges the change request received "in late April" and states "[w]e are endorsing [increase in coverage] today to be effective 5/1/02." It is unclear how an internal Ohio Casualty email communication - of which neither party to this litigation was aware at the time- could have misled either party. Because Ohio Casualty is

9

not a party and because an issue of fact exists as concerning whether Ohio Casualty had or had not

retrieved and approved the Change Request, summary judgment will be denied.

        **2.**      **Agency**

           **a.**      **Actual Authority**

Defendants further contend that Ohio Casualty is bound by the $4.2 million replacement value

coverage to Odd Fellows because defendants acted properly as the agents of Ohio Casualty in

obtaining the coverage.  "An insurer shall be liable for the acts of its agents when the agents are acting in

their capacity as representatives of the insurer and are acting within the scope of their authority."  KRS

§304.9-020.  An agent is further defined as "an individual or business entity appointed by an insurer to

sell or to solicit applications for insurance or annuity contracts or to negotiate insurance or annuity

contracts on its behalf."  KRS §304.9-035.

An agent acts within his scope of authority when he induces a client to change his health

insurance from one insurance company to another insurance company by misrepresenting the extent of

coverage contained in the latter's policy.   In *Pan American Life Ins. Co. v. Roethke*, 30 S.W.3d

128, 132 (Ky  2000), the insurance agent advised his client, the plaintiff, to change his insurance

coverage from one company to another.  *Id*. at 129.  The insurance agent failed to notify the plaintiff

that coverage for work-related injuries on the new policy was optional and could only be obtained by

purchasing a rider.  *Id*. at 130.  Because the plaintiff was not aware of this fact, he failed to obtain the

necessary rider and  the insurance company subsequently denied plaintiff benefits for his work-related

injuries. *Id*.  Plaintiff sued both the insurer and the agent.  The trial court initially granted summary

judgment to the insurer, but the Kentucky Court of Appeals reversed and the Supreme Court affirmed.

The appellate courts agreed that the insurer could be held liable if its agent had acted within his scope of authority. *Id*. at 132.

As illustrated in *Pan American*, a principal is liable for the acts of its agent under Kentucky law when the agent acts within the scope of his authority.  Like the doctrine of estoppel, however, this doctrine is typically applied by a plaintiff insured against a defendant insurer.  The defendants cite to no case authority - nor has this court discovered any - in which the doctrine has been applied by a defendant agent against a non-party insurer to benefit the agent and escape liability to the injured insured.   On the facts presented, as well as for the equitable reasons which preclude application of the doctrine of estoppel, this court declines to apply defendants' agency theory to bind Ohio Casualty to the actions of the defendants.

In the alternative, genuine issues of material fact preclude summary judgment.  Tuten and Kinker are agents of Ohio Casualty. [MacKendrick depo. at 34].  As a result, Ohio Casualty would be bound by any act of Tuten and Kinker only if they acted within the scope of their authority as representatives of Ohio Casualty.  Conflicting testimony exists as to whether Tuten and Kinker acted within their scope of authority to bind Ohio Casualty to the Change Request.  Ms. Arnett testified that such a request must be affirmatively accepted by Ohio Casualty before it takes effect, a fact with which Tuten appears to agree. [Arnett depo. at 163; Sworn Statement 10/2/02 of Sam Tuten; *see also* Bogenschutz depo. at 35.]   Although Ohio Casualty underwriter manager, Robert MacKendrick, testified generally that "[Tuten and Kinker] have binding authority...with Ohio Casualty...based on the agent's guide,"  [MacKendrick depo. at 34], MacKendrick did not specifically articulate whether the guide permits an agent to approve a Change Request.   Ohio Casualty underwriter Sharon Arnett

11

testified that it would be an error in judgment if an agent submitted a Change Request to Ohio Casualty and then assumed after a passage of time that the request had been granted.  [Arnett depo. at 163].  Therefore, a material issue of fact exists as to whether defendants possessed actual authority to bind Ohio Casualty.

### ii.    Apparent Scope of Authority

A principal can also be liable for the acts of its agent that are not within the actual authority of its agent when the agent is held out by the principal as possessing such authority.  *See, e.g., Estell v. Barrickman*, 571 S.W.2d 650, 652 (Ky. Ct. App. 1978)(denying summary judgment to employer where employer/principal was aware of employee-agent's practice of permitting nonbusiness passengers to ride in company vehicles, and plaintiff-passenger was injured during trip).   Under Kentucky law, an agent has apparent authority when the principal "holds out" the agent as possessing authority.  As in *Barrickman*, the doctrine is typically wielded as a sword by an injured plaintiff against a principal  - not as a shield by an agent against the injured plaintiff.  The defendants do not cite to any Kentucky case law applying the doctrine in the unlikely fashion advanced here.

Even if the defendants had cited any supportive case law, summary judgment would be denied because genuine issues of material fact exist concerning whether Ohio Casualty "held out" Tuten and Kinker as having the authority to bind Ohio Casualty to the type of Change Request submitted here.  To prove apparent authority, defendants must show both that Ohio Casualty held Kinker and Tuten out in such a way as to lead a reasonable person to conclude that defendants possessed actual authority to bind the insurer, and that plaintiffs acted in reliance on that representation.  *Sims v. Marriott Int'l, Inc.,* 184 F. Supp.2d 616, 617 (W.D. Ky. 2001).  If - as plaintiffs contend in this case- the defendant-

12

agents knew that they did not possess actual authority to bind Ohio Casualty to the Change Request - then defendants also must provide express evidence of plaintiffs' reliance. *See Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001). In this case, defendants cite plaintiffs' testimony that plaintiffs believed speaking to Kinker was sufficient to bind Ohio Casualty**,** but offer no evidence that Ohio Casualty acted in a manner (such as a prior course of conduct) that would lead plaintiffs to draw that conclusion.

### B.       Negligent Misrepresentation

Defendants also argue that they are entitled to judgment as a matter of law on plaintiffs' claim of negligent misrepresentation, in light of plaintiffs' concession that they were notified by Ohio Casualty on May 24, 2002 that the Change Request had been denied. However, construing the record in favor of the plaintiffs, there is evidence that Tuten was aware on the day of the fire that the Change Request was still being processed by Ohio Casualty. [Bogenshutz depo. at 35]If Tuten was so aware, a reasonable person could find that he was negligent in his representations to Odd Fellows for at least the period between May 21 and May 24

The defendants alternatively claim entitlement to summary judgment on the basis that the plaintiffs have suffered no damages even if Tuten misrepresented the scope of coverage during the three day period in question. Whereas plaintiffs allege that they expended $500,000 to shore up damaged walls in order to renovate the building at a later date, plaintiffs also testified that the walls required support for safety reasons, even if the building were to be demolished. [D. Sells at 158, K. Sells depo vol. II at 47].

The issue is close, but material facts preclude summary judgment. Plaintiffs allege that they

contracted with the City of Covington to continue the renovation project based upon Tuten's representations.  If plaintiffs can prove that the expense of shoring up the walls for demolition would have been less than the expense of shoring up the walls for renovation, or that they incurred other expenses based on the anticipated renovation prior to May 24, then Tuten could be liable for those damages.  However, it is unclear whether plaintiffs can recover damages based upon the alleged misrepresentation following notification of Ohio Casualty's position on coverage on May 24, 2002.

### C.      Intentional Misrepresentation

Defendants are clearly entitled to summary judgment on plaintiffs' claim of intentional misrepresentation. Plaintiffs have failed to present any evidence at all in support of this claim.      **III.**

### Conclusion and Order

For the reasons stated herein, **IT IS ORDERED THAT**:

1.  The motion of defendants E. Kinker & Co. and Sam Tuten for summary judgment on the plaintiffs' intentional misrepresentation claim is **granted**;

2.  The motion of defendants E. Kinker & Co. and Sam Tuten for summary judgment on all other claims is **denied**.

This 12th day of July, 2005.



Signed By:

*J. Gregory Wehrman*

**United States Magistrate Judge**